IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 03-cv-00115-MEH-BNB

FEDERAL DEPOSIT INSURANCE CORPORATION, AS RECEIVER FOR
BESTBANK, BOULDER, COLORADO,

    Plaintiff,

v.

ST. PAUL COMPANIES, and ST. PAUL FIRE AND MARINE INSURANCE
COMPANY, AS SUCCESSORS IN INTEREST TO UNITED STATES FIDELITY &
GUARANTY COMPANY,

    Defendants.

---

## MEMORANDUM OPINION AND ORDER
---

Before the Court are Defendants' Motion for Summary Judgment [dock. # 80] and Plaintiff FDIC's Cross-Motion for Partial Summary Judgment [dock. #82]. Pursuant to 28 U.S.C. § 636(c), the parties consented to the determination of this case by a United States Magistrate Judge. The matters are now fully briefed, and oral argument would not materially assist the Court in adjudicating these motions. For the reasons stated below, the Court **grants in part and denies in part** Defendants' Motion for Summary Judgment and **denies** Plaintiff's Cross-Motion for Partial Summary Judgment.

**I.    Facts**

The following facts are not disputed, unless otherwise noted. Defendant USF&G issued Finanical Institution Bond No. FIB 14541253100 on behalf of BestBank (the "Bond"). Scheduling Order, Dock. #77, Undisputed Fact ¶ 1. The Bond includes two insuring agreements that are the subject of this dispute, the Insuring Agreement "(A) FIDELITY" and Insuring Agreement "(L) COMPUTER SYSTEMS FRAUD." *Id.* at ¶ 2. The maximum amount of coverage for a single loss

under the Bond is $3,000,000.00 *Id.* at ¶ 3. Plaintiff Federal Deposit Insurance Company ("FDIC") was appointed receiver of BestBank on July 23, 1998. *Id.* at ¶ 23. FDIC provided notice of loss to Defendants on August 13, 1998. *Id.* at ¶ 24. FDIC provided proof of loss on January 21, 1999. Complaint, Dock. #1 at ¶25.

The Bond requires that notice be provided to Defendants within 30 days of the discovery of the loss. Defendants' Motion, Dock. #80, Exh. 1 (the Bond), Section 5. The Fidelity Insuring Agreement of the Bond provides coverage for the following:

> Loss resulting directly from dishonest or fraudulent acts committed by an Employee acting alone or in collusion with others. Such dishonest or fraudulent acts must be committed by the Employee with the manifest intent:
>
> (1) to cause the insured to sustain such loss; and
> (2) to obtain financial benefit for the Employee or another person or entity.
>
> However, if some or all of the Insured's loss results directly or indirectly from and Loan, that portion of the loss is not covered unless the Employee was in collusion with one or more parties to the transactions and has received, in connection therewith, a financial benefit with a value of at least $2,500.
>
> As used throughout this Insuring Agreement, financial benefit does not include any employee benefits earned in the normal course of employment, including: salaries, fees, bonuses, promotions, awards, profit sharing or pensions.

*Id.*, Insuring Agreement A. Employee is defined in the Bond to include "each natural person, partnership or corporation authorized by the Insured to perform services as data processor of checks or other accounting records of the Insured (not including preparation or modification of computer software or programs), herein called Processor." *Id.*, Section 1, Definition (l).

Coverage for Computer Systems Fraud is provided as follows:

Loss resulting directly from a fraudulent

> (1) entry of Electronic Date or Computer Program into, or
> (2) change of Electronic Date or Computer Program within

2

any Computer System operated by the Insured, whether owned or leased; or any Computer System identified in the application for this bond; or a Computer System first used by the Insured during the period, as provided by General Agreement B; provided the entry or change causes

> (i) Property to be transferred, paid or delivered,
> (ii) an account of the Insured, or of its customer, to be added, deleted, debited or credited, or
> (iii) an authorized account or a fictitious account to be debited or credited.

> In this Insuring Agreement, fraudulent entry or change shall include such entry or change made by an Employee of the insured acting in good faith

>> (a) on an instruction from a software contractor who has a written agreement with the insured to design, implement or service programs for a Computer System covered by this Insuring Agreement, or
>> (b) on an instruction transmitted by Tested telex or similar means of Tested communication (except a Telefacsimile Device) identified in the application for this bond purportedly sent by a customer, financial institution, or automated clearing house.

*Id.*, Insuring Agreement L.

> The Termination or Cancelation section reads in part:

> This bond terminates as to any Employee or any partner, officer or employee of any Processor – (a) as soon as any Insured, or any director or officer not in collusion with such person, learns of any dishonest or fraudulent act committed by such person at any time, whether in the employment of the Insured or otherwise, whether or not of the type covered under insuring Agreement (A), against the Insured or any other person or entity, without prejudice to the loss of any Property then in transit in the custody of such person, or (b) 15 days after the receipt by the Insured of written notice from the Underwriter of its desire to cancel this bond as to such person.

*Id.*, Section 12. The Bond's Notice/Proof section states, "This bond affords coverage only in favor of the insured. No suit, action or legal proceedings shall be brought hereunder by any one other than the named insured." *Id.*, Section 5(f).

Edward T. Mattar, III, was the CEO of BestBank, as well as a member of the Board of Directors, and owned 100% of BestBank's stock. Scheduling Order, Dock. #77, Undisputed Fact

¶¶ 4-5. T. Alan Boyd was the President of BestBank and also a member of the Board of Directors. *Id.* at ¶ 6. Jack O. Grace was the Chief Financial Officer. *Id.* at ¶ 7. In 1994, BestBank and Century Financial Services, Inc. ("Century"), entered into a Marketing, Processing, and Consulting Agreement ("First MPCA"). *Id.* at ¶ 10. Century is owned by Doulgas R. Baetz and Glenn M. Gallant. *Id.* at ¶ 18. In 1996, Century began selling travel memberships issued through the All Around Travel Club Program ("AATC") that also offered new customers a BestBank-issued VISA credit card, and the initial travel club charges could be charged to the BestBank-issued VISA credit card. *Id.* at ¶¶ 11-12. The First MPCA was renewed, with modifications, in January 1997. *Id.* at ¶ 8; Defendants' Motion, Dock. #80, Exh. 7 (MPCA). At the time of BestBank's closure in July 1998, over 500,000 accounts had been established in the AATC program. *Id.* at ¶ 14.

Under the MPCA, Century agreed to purchase all delinquent accounts. Defendant's Motion, Dock. #80, Exh. 7 (MPCA) at Section 3.4. In 1996, Century, under the direction of Beatz and Gallant, began re-aging accounts by applying non-existent credits to accounts in even dollar amounts (usually multiples of $20) so that they would appear current. Complaint at ¶¶47-50. At some point, Mattar, Boyd, and Grace of BestBank were all made aware of this fraud. Defendants' Motion, Dock. #80, Exh. 26 (Findings Pursuant to Rule 23(c)) at 30, 32. Rather than ending it, they joined the scheme. *Id.* By 1998, the losses associated with this re-aging were estimated to be approximately $40 million. Defendants' Motion, Dock. #80, Exh. 20 (Dep. of Bour) at 76.

Mattar, Boyd, and Grace of BestBank and Baetz and Gallant of Century were all criminally charged for their involvement in this fraudulent scheme. Scheduling Order, Dock. #77, Undisputed Fact ¶¶ 26-30. Each of them were found guilty of various counts of the second superseding indictment filed against them in Criminal Action No. 03-cr-00232-RPM, in the United States District

4

Court for the District of Colorado. *Id.*

## II. Discussion

### A. Legal Standard for Summary Judgment

A motion for summary judgment serves the purpose of testing whether a trial is required. *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1185 (10th Cir. 2003). The Court shall grant summary judgment if the pleadings, depositions, answers to interrogatories, admissions, or affidavits show there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). A fact is material if it might affect the outcome of the suit under the governing substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The non-moving party has the burden of showing that there are issues of material fact to be determined. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party bears the initial responsibility of providing to the Court the factual basis for its motion and identifying the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, which reveal that there are no genuine issues as to any material facts, and that the party is entitled to summary judgment as a matter of law. *Id.* at 323; *Maldonado v. City of Altus*, 433 F.3d 1294, 1302 (10th Cir. 2006). If the movant properly supports a motion for summary judgment, the opposing party may not rest on the allegations contained in his complaint, but must respond with specific facts showing a genuine factual issue for trial. *Hysten v. Burlington Northern and Santa Fe Ry.*, 296 F.3d 1177, 1180 (10th Cir. 2002); Fed. R. Civ. P. 56(e). These specific facts may be shown "'by any of the kinds of evidentiary materials listed in Rule 56(c), except the mere pleadings themselves.'" *Pietrowski v. Town of Dibble*, 134 F.3d 1006, 1008 (10th Cir. 1998) (quoting *Celotex*, 477 U.S. at 324). "[T]he content of summary judgment evidence

must be generally admissible and . . . if that evidence is presented in the form of an affidavit, the Rules of Civil Procedure specifically require a certain type of admissibility, *i.e.*, the evidence must be based on personal knowledge." *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1122 (10th Cir. 2005). Finally, "[t]he court views the record and draws all favorable inferences in the light most favorable to the non-moving party." *Pepsi-Cola Bottling Co. of Pittsburg, Inc. v. Pepsico, Inc.*, 431 F.3d 1241, 1256 (10th Cir. 2005).

With an insurance contract, the Court applies standard contract law. *FDIC v. American Casualty Co.*, 843 P.2d 1285, 1289-90. "If the insurance policy is unambiguous, it should be enforced according to its plain terms." *Id.* (citing *Kane v. Royal Ins. Co. of America*, 768 P.2d 678, 680 (Colo. 1989). Only in an instance of ambiguity should the agreement be construed against the insurer to find coverage. *Id.*

### B. Defendants' Motion for Summary Judgment

#### 1. FDIC's Standing

Defendants argue that the Bond's Notice/Proof Section allows only the named Insured, BestBank, to sue on the Bond and that, therefore, the FDIC cannot make a claim on the Bond. Defendants also rely on 12 U.S.C. § 1821(e)(13)(A) for the proposition that the FDIC cannot recover on a depository institution bond if the terms of the bond prevent FDIC from doing so. In addition, Defendants argue that Colorado law does not allow FDIC to recover under the Bond, because the Bond terminated when FDIC took over the bank. In turn, Plaintiff argues that Defendants have misinterpreted state and federal law and that the FDIC has stepped into the shoes of BestBank, as the receiver, and can assert a claim as the insured.

As a general matter, FDIC "succeeds to – all rights, titles, powers, and privileges of the

insured depository institution." 12 U.S.C. § 1821(d)(2)(A)(i). "This language appears to indicate that the FDIC as receiver 'steps into the shoes' of the [depository institution], obtaining the rights 'of the depository institution' that existed prior to receivership." *O'Melveny & Myers v. FDIC*, 512 U.S. 79, 86 (1994) (citations omitted). Pursuant to 12 U.S.C. § 1821(e)(13)(A), FDIC may enforce a contract entered into by the depository institution other than a depository institution bond, "notwithstanding any provision of the contract providing for termination default, acceleration, or exercise of rights upon, or solely by reason of, insolvency or the appointment of a conservator or receiver." This statute does not support Defendants' position. The parties do not dispute that, under the terms of the Bond, the Bond terminated when FDIC took over BestBank. The statute cited by Defendants would not allow FDIC to avoid the termination of the Bond. Yet this does not resolve the issue of Defendants' liability for losses prior to the termination of the Bond. As the termination section of the Bond states: "Termination of the bond as to any Insured terminates liability for any loss sustained by such Insured which is discovered after the effective date of such termination." Defendants' Motion, Dock. #80, Exh. 2, Section 12. As long as the loss is discovered prior to the termination of the Bond, liability is not terminated. *See Sharp v. FSLIC*, 858 F.2d 1042, 1048 (5th Cir. 1988) (upholding a termination clause, thereby precluding coverage for claims discovered after the takeover).

Defendants next argue that only the insured may file suit and that FDIC, as a receiver, does not become the insured. Defendants' argument is a distinction without a difference in this case. The Bond is an asset of BestBank, to which FDIC succeeded to all rights. *FDIC v. Oldeburg*, 34 F.3d 1529, 1552 (10th Cir. 1994) (rejecting contention that the bond could not become an asset until proof of loss was substantiated). Defendants contend that no rights yet existed, because BestBank

7

must also provide notice of the claim, not a receiver. The actions of FDIC in this regard are within its rights to which it succeeded under the Bond. Provided that BestBank discovered the loss prior to the takeover, *i.e.*, prior to termination of the Bond, FDIC could step into the shoes of BestBank and assert the rights of BestBank under the Bond in providing notice and proof of the loss, and seeking enforcement of the Bond.

## 2. Coverage under Section A, Fidelity Insuring Agreement

Defendants argue that coverage terminated under Section A because BestBank failed to provide notice of the loss within 30 days after the loss was discovered. "Discovery occurs when the Insured first becomes aware of facts which would cause a reasonable person to assume that a loss of a type covered by this bond has been or will be incurred, regardless of when the act or acts causing or contributing to such loss occurred, even though the exact amount or details of loss may not then be known." Defendants' Motion, Dock. #80, Exh. 2 (the Bond), Section 3 Discovery. The insured becomes aware of such facts when either honest employees or honest directors of the insured become aware of facts that would cause a reasonable person to assume that a covered loss has or will occur. *Oldenburg*, 34 F.3d at 1543; *see also Gulf USA Corp. v. Fed. Ins. Co.*, 259 F.3d 1049, 1058 (9th Cir. 2001) (citing *American Surety Co. v. Pauly*, 170 U.S. 133, 147 (1898)). As discussed below, genuine issues of material fact preclude summary judgment on the issue of when an honest employee or director of BestBank should have discovered that a covered loss has occurred or will occur by an employee under the Fidelity Insuring Agreement.

### a. Discovery of losses caused by an Employee

The Bond defines Employee, to which the Section A Fidelity Insuring Agreement applies,

to "each natural person, partnership or corporation authorized by the Insured to perform services as data processor of checks or other accounting records of the Insured . . . , herein called Processor." Defendants' Motion, Dock. #80, Exh. 2 (the Bond), Section 1, Definition (l). Defendants argue, unconvincingly, that Century is a Processor as that term is defined in the Bond and, as such, is covered as an Employee under the Fidelity Insuring Agreement of the Bond. Defendants' Motion, Dock. #80, Exh. 8, FDIC's Answers to Interrogatories, Response, No. 10. Defendants rely on FDIC's discovery response stating that Century is a Processor. However, the relationship between Century and BestBank, through the MPCA Agreement, belies this assertion. Century agreed to "perform all processing services for the Card Program relating to applications, evaluation of credit worthiness of Card applicants (based on Bank's criteria), Card issuance, Card Account maintenance, customer service, security, collections, and other normal and ordinary operation of the Card Program." Defendants' Motion, Dock. #80, Exh. 6 (MPCA), Section 2.1(c).

While the word "processing" is used, Article IV of the MPCA, titled "Processing of Transactions; Handling of Funds," states that "Bank shall select an independent processing operation ("IPO") to process Card transactions. Century shall pay all costs of processing Card transactions." *Id.* at Section 4.1(a). Defendants have not established that Century was authorized to "perform services as data processor *of checks or other accounting records*," or, in fact, did so. Defendants' Motion, Dock. #80, Exh. 1 (the Bond), Section 1 Definition (l)(emphasis added). Instead, Century re-aged accounts by applying non-existent credits to delinquent accounts, which Mr. Bour, an employee of BestBank and a former bank examiner, assumed was being done by the Bankcard Center "or someplace where they were doing the processing," not by Century. Defendants' Motion, Dock. #80, Exh. 20 (Dep. of Bour) at 87. The MPCA specifically addresses the selection of a third-

9

party processor for handling payments, and Defendants have presented insufficient evidence that Century actually performed data processing services of checks or other accounting records for BestBank.

Defendants next assert that Mattar's knowledge of his own fraud, as 100% shareholder of BestBank, constitutes knowledge of the Insured. Whether his knowledge is imputed to BestBank is a matter that must be resolved by looking to Colorado law, and Defendants cite no Colorado law on this point, choosing instead to rely on factually distinguishable cases that are based on the laws of other states. *E.g.*, *Red Lake County State Bank v. Employer's Ins. of Wausau*, 874 F.2d 546, 549-50 (8th Cir. 1989) (finding no coverage under Minnesota law because dishonest acts were committed by the 92% shareholder who, as "president, chief operating officer, and director of the bank . . . for all practical purposes, was the bank."). Colorado law recognizes an exception to the adverse-interest principle with "what is commonly referred to as the 'sole actor' or 'dominant person' doctrine." *Vail Nat'l Bank v. Finkelman*, 800 P.2d 1342, 1345 (Colo. Ct. App. 1990). Under the sole actor doctrine, the adverse actions of an agent are imputed to the corporation if that agent is "the sole representative of the principal during the transaction in question, or ha[s] such dominance over the principal as to be its alter ego." *Id.* Although Mattar was 100% shareholder for BestBank and CEO, the bank was not his alter ego, in that the Board of Directors was comprised of seven members during 1997-1998. FDIC Response, Dock. #81, Exh. 3 (Affidavit of Wolfschlag) at ¶ 3. Further, there is no evidence that he dominated the actions of BestBank or the other members of the Board of Directors.

Finally, Defendants have presented no evidence that BestBank was aware of the conduct of Mattar, Boyd, and Grace prior to July of 1998. In fact, Mr. Wolfschlag questioned Mr. Boyd and

10

Mr. Grace, and they informed him that they were doing nothing illegal. *Id.* at ¶ 8. "Mere suspicion of loss by the insured is not sufficient to trigger the notice requirement." *First Dakota Nat'l Bank v. Saint Paul Fire & Marine Ins. Co.*, 2 F.3d 801, 807 (8th Cir. 1993). While this information was sufficient for discovery of any loss caused by Century, as discussed below, it was not sufficient for discovery caused by BestBank employees. Notably, even if Century were an Employee under the Bond, that would not terminate the Bond in its entirety. The Termination Section of the Bond states that the Bond terminates as to that Employee or Processor as soon as the Insured learns of any fraudulent or dishonest act committed by such person. Defendants' Motion, Dock. #80, Exh. 2 (the Bond), Section 12. The Bond would have terminated only as to Century in January 1998. Accordingly, under either interpretation, when Mattar, Boyd, and Grace joined the fraudulent scheme, they were still covered Employees under the Bond. Stated differently, even though Century's scheme was discovered in January 1998, it has not been established that the involvement of Mattar, Boyd, and Grace was discovered by a "director or officer not in collusion with such person" prior to July of 1998, which is when Mr. Wolfschlag testified that he was made aware of the fraud. Therefore, summary judgment for Defendants on this issue is denied.

      **b.**      **Financial Benefit**

A loss is covered by the Fidelity Insuring Agreement if the Employee commits dishonest or fraudulent acts with the "manifest intent: (1) to cause the Insured to sustain such loss; and (2) to obtain financial benefit for the Employee or another person or entity." Defendants' Motion, Dock. #80, Exh. 2(the Bond) Section A. Financial benefit does not include "any employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions." *Id.* Defendants contend that Mattar and Boyd received bonuses

11

as a result of the fraud and that bonuses are a financial benefit which are expressly excluded from coverage under the Bond. *See Morgan, Olmstead, Kennedy & Gardner, Inc. v. Federal Ins. Co.*, 637 F. Supp. 973, 977 (S.D.N.Y 1986) (finding that fraud intended to increase profit sharing was excluded from coverage under the express terms of the bond). In turn, Plaintiff points out that dishonest acts committed to obtain financial benefit for "another person or entity" are also covered. Plaintiff argues that, because Mattar and Boyd intended to provide benefit to Century's principals Baetz and Gallant, their financial benefit through bonuses is immaterial. Plaintiff also asserts that these bonuses were not "earned in the normal course of business," because the money was stolen, not earned, and was a form of embezzlement. Here, Plaintiff has set forth sufficient evidence to preclude summary judgment, because the financial benefit from the fraudulent scheme was not limited to bonuses. Rather, Mattar, Boyd, and Grace's conduct provided significant financial benefit to Baetz and Gallant. As Mr. Bour testified, Mr. Boyd informed him that the relationship with Beatz and Gallant was very valuable. Defendants' Motion, Dock. #80, Exh. 20 (Dep. of Bour) at 92.

### 3. Coverage under Section L, Computer Systems Fraud

As mentioned above, Century's fraudulent conduct was discovered no later than January 1998. Knowledge of an employee is imputed to the Insured if the employee is honest. Defendants argue that John J. Schmalzer, a Vice President of BestBank and the Risk Manager, was aware of Century's conduct as early as 1996. However, Defendants rely on FDIC's Decision and Order Denying Termination of Order of Prohibition from Further Participation. Defendants' Motion, Dock. #80, Exh. 19. This Decision also points out that, although Schmalzer was aware of Century's conduct, he failed to report his findings to BestBank's board. *Id.* at 2. "As such, he knowingly

12

participated in the funding of poor quality credit card receivables." *Id.* The Decision provides similar comments for Mr. Schmalzer's report in 1998. Because of this conduct, Defendants cannot rely on Mr. Schmalzer's knowledge to assert that an honest employee of BestBank "discovered" the potential loss.

Defendants also argues that BestBank discovered the loss when a former employee, Jon Weidmaier, contacted the State of Colorado "with allegations regarding the bank's relationship with Century." Defendants' Motion, Dock. #80, Exh. 18 (FDIC Audit Report) at 32. Although Defendants cannot rely on arguments of counsel in a criminal proceeding, the Findings Pursuant to Rule 23(c) by United States District Judge Richard Matsch state that Weidmaier expressed his concerns that Century was re-aging accounts in May 1995. Defendants' Motion, Dock. #80, Exh. 26 at 7. The reports establishing this conduct "were already available at the Bank" because "Weidmaier had them." *Id.* Weidmaier, however, reported this to Mr. Boyd and Mr. Grace, who joined the conspiracy. Under Colorado law, notice to an agent of a corporation constitutes notice to the corporation unless the agent is acting adversely to the corporation. *Vail Nat'l Bank*, 800 P.2d at 1344-45. "This exception is based on the theory that the agent cannot be presumed to communicate his knowledge to the principal when he is acting in his own interests and against the interests of the principal." *Id.* Moreover, Mr. Weidmaier's report, as a former employee, to FDIC does not constitute discovery by the Insured, because FDIC did not investigate BestBank at that time. *E.g.*, *Oldenburg* 34 F.3d at 1543 (holding that extensive investigation and issuance of cease and desist orders by FSLIC demonstrated the bank's awareness of the potential loss). On the facts presented, the Court cannot say as a matter of law that Mr. Weidmaier's knowledge by itself constitutes discovery by the Insured, since his report to those who were part of the fraud does not

13

constitute notice. *See Federal Savings & Loan Ins. Corp. v. Aetna Casualty & Surety Co.*, 785 F. Supp. 867, 869-70 (D. Mon. 1990) (analyzing when board members not in collusion with the dishonest employees became aware of the conduct).

Defendants further rely on discovery by Mr. Bour and Mr. Hitt in January 1998. Mr. Bour assisted Mr. Schmalzer in risk management, and Mr. Hitt, who was responsible for settlement of the credit card portfolio, reported to CFO Jack Grace. Defendants' Motion, Dock. #80, Exh. 8 (FDIC's Answer to Interrogatories) at ¶ 22. Again, both individuals who discovered the loss reported to officers of BestBank who were involved in the fraud. As with Mr. Weidmaier, their knowledge does not constitute knowledge of the Insured, because they reported the fraud to directors who were acting in collusion with Century.

Mr. Bour first reported the account re-aging to Mr. Wolfschlag, an officer of BestBank who was not involved in the fraud, in January 1998. Defendants' Motion, Dock. #80, Exh. 21 (Dep. of Wolfschlag) at 18-20. Mr. Wolfschlag testified that he questioned Mr. Grace and Mr. Boyd, but they told him that they were doing nothing illegal. *Id.* Mr. Grace testified that the re-aging was discussed at a Board of Directors meeting in February of 1998. Defendants' Motion, Dock. #80, Exh. 12 (Dep. of Grace) at 155. Conversely, Mr. Wolfschlag states that, after being assured by Mr. Grace and Mr. Boyd in January 1998 that Century was not doing anything illegal, he did not hear about the credit re-aging again until the Board's annual summer retreat during the week of July 18-25, 1998. FDIC's Response, Dock. #81, Exh. 3 (Affidavit of Wolfschlag) at ¶¶ 8-9. Nevertheless, the undisputed knowledge of Mr. Hitt and Mr. Bour, which was passed on to an honest member of the Board of Directors, can reasonably be imputed to the Insured as a matter of law, regardless of whether Mr. Wolfschlag followed up this report with an investigation. Such knowledge passes the

14

"low threshhold" required for discovery of Century's conduct. *Oldenburg*, 34 F.3d at 1542 (citing *California Union Ins. v. American Diversified Sav.*, 948 F.2d 556, 563 (9th Cir. 1991).

Although Century's fraud was discovered in January 1998, notice was not provided to Defendants until August 1998. This late notice, well beyond the 30-day maximum allowed under the Bond, precludes FDIC's ability to recover under the Computer Systems Fraud coverage for losses caused by Century's conduct, unless the Court adopts the notice/prejudice rule posited by Plaintiff. As discussed below, the Court will not do so.

In addition, Section 2 Exclusions of the Bond excludes coverage for "loss caused by an **Employee**, except when covered under Insuring Agreement (A)," and plaintiff cannot recover for losses caused by the conduct of Mattar, Boyd, or Grace under this Section. Accordingly, Defendants' Motion for Summary Judgment is granted as to the claim for coverage under Section L, Computer Systems Fraud.

### C. Plaintiff's Cross-Motion for Summary Judgment

The crux of Plaintiff's Cross-Motion is that, regardless of whether notice was submitted more than 30 days after the loss was discovered, Defendants must establish prejudice to deny coverage. Plaintiff acknowledges that, traditionally, courts have found no liability if the insured fails to give timely notice, without consideration of prejudice to the insurer, because the strict construction of the insurance contract requires notice within 30 days. Plaintiff contends that the law is shifting and that this Court should find that the Colorado Supreme Court would now adopt a notice/prejudice rule. Under this rule, an insurer must establish that they were prejudiced by the late notice to avoid liability. Defendants argue in response that the Colorado courts' recent trend toward the notice/prejudice rule does not apply in this case, and that it can amply demonstrate prejudice

15

based on the increase in the amount of the bond after Defendants allege that BestBank should have provided notice of the loss. As set forth below, the Court declines to extend the notice/prejudice rule to fidelity bonds.

Plaintiff argues that the Colorado Supreme Court's recent adoption of the notice/prejudice rule in *Friedland v. Traveler's Indemnity Co.*, 105 P.3d 639 (Colo. 2005), in the context of liability policies should be extended to this Bond. Plaintiff relies on *Transamerica Premier Ins. Co. v. Brighton Sch. Dist.*, 940 P.2d 348, 353 (Colo. 1997) (en banc) (finding that a commercial surety owes a duty to its insured to handle claims in good faith), for the proposition that the Colorado Supreme Court does not distinguish commercial surety bonds from other types of insurance and would, therefore, extend the application of the notice/prejudice rule to this case. Plaintiff states that, in the absence of controlling precedent from the Colorado Supreme Court, this Court must predict what decision the Colorado Supreme Court would reach on this issue. *See Stuart v. Colo. Interstate Gas Co.*, 271 F.3d 1221, 1228 (10th Cir. 2001) ("When no decision of a state's highest court has addressed an issue of that state's law, the federal court confronted with that issue 'must predict how [the State's] highest court would rule.'") (citation omitted).

While Plaintiff's premise is correct, its application in this case is not, because there is no absence of controlling precedent. It is clear that existing law in Colorado regarding fidelity bonds and financial institution bonds follows the traditional approach. In *Pueblo Athletic Club v. American Bonding Co.*, 307 P.2d 813 (Colo. 1957), the Colorado Supreme Court upheld the denial of coverage under a dishonesty bond because the insured failed to give timely notice and failed to prove dishonesty on the part of the employee. Admittedly with little analysis, the Court stated, "[n]ot only because the plaintiff failed to give defendant timely and proper notice and proof of the alleged

16

fraudulent or dishonest acts, but because the plaintiff did not produce direct and positive proof of a loss due to the dishonesty of Mr. Heitsch, the ruling of the trial court was correct." *Id.* at 815. Previously, the Colorado Supreme Court in *Thomas-Hickerson Motor Co. v. Central West Casualty Co.*, 45 P.2d 631 (Colo. 1935), upheld the denial of a claim brought more than six months after the termination of the bond because the insured "lost its right to enforce the claims" when the six-month deadline contemplated in the bond expired. *Id.* at 632. Thus, under Colorado law, the traditional approach clearly applied to fidelity bonds. As long as this precedent is controlling, this Court cannot overrule existing Colorado law on the basis that the Colorado Supreme Court might do so in the future. For this reason, the notice/prejudice rule can apply in this case only if *Friedland* is properly interpreted as overruling these cases or already extending to other types of insurance.

The *Friedland* Court extended the notice/prejudice rule first announced in *Clementi v. Nationwide Mutual Fire Ins. Co.*, 16 P.3d 223 (Colo. 2001) (limiting its adoption to the under insured motorist context), to liability insurance policies. In so doing, the Court relied on three policy arguments: "(1) the adhesive nature of insurance contracts, (2) the public policy objective of compensating tort victims, and (3) the inequity of the insurer receiving a windfall and the insured not receiving policy benefits, due to a technicality." *Id.* at 645-46. As the Court explained:

> First, an insured has an unequal bargaining position when contracting for either liability coverage or UIM coverage. . . . In both liability and UIM contracts, as with the case now before us, the insured is typically provided with form contracts promulgated by the insurer, and there is a disparity of bargaining power. Second, liability coverage is for the protection of the insured against liability to a third party and for the protection of the innocent tort victim who suffers personal injury or property damage for which the insured is liable. . . . Third, as with UIM coverage, the insured pays premiums for the protection provided by the liability policy, and the insurer should not reap a windfall through a technicality it invokes to deny coverage.

*Id.* at 646 (citations omitted).

17

This rationale does not apply to the Bond at issue in this case. There is not unequal bargaining power between the parties, because the terms of this Bond were negotiated between two commercial entities. *FDIC v. Insurance Co. of North America*, 105 F.3d 778, 786 (1st Cir. 1997)("[T]he fidelity bond is an arms-length, negotiated contract between sophisticated business entities, the standard form for which was drafted by the joint efforts of the Surety Association of America and the American Bankers Association.") (citation omitted). Importantly, the Colorado Supreme Court recognized this principle in *Transamerica Premier Ins. Co.*, 940 P.2d at 353. In extending first-party bad faith claims to the commercial surety context, the Court noted that "[a]lthough the parties to a suretyship agreement are on equal footing in terms of bargaining power when they enter into the agreement, it is the commercial surety who controls the ultimate decision of whether to pay claims made by the obligee under the terms of the surety bond." *Id.* As such, the Colorado Supreme Court has recognized that the policy consideration present in adhesion contracts is not present in the Bond at issue. These policies are similar with respect to the claims process, but not with respect to how the contract is entered. Based on this distinction, the Court concludes that *Friedland* did not overrule prior precedent related to fidelity bonds, and this Court is, therefore, bound to follow controlling Colorado precedent.[1]

Even if the notice/prejudice rule were to be adopted by the Colorado Supreme Court in this context, Plaintiff is incorrect that Defendants cannot establish prejudice in this case. *Friedland* contemplates a two-step inquiry under the notice/prejudice rule. "The trial court determines whether

---

[1] Plaintiff's citation of Utah law in *Oldenburg*, 34 F.3d at 1545, as well as Kansas law in *Nat'l Union Fire Ins. Co. of Pittsburgh v. FDIC*, 957 P.2d 357, 360-61 (Kan. 1998), might be persuasive authority for the argument that the Colorado Supreme Court should discontinue its application of the traditional approach in fidelity bond cases. One again, however, it is not within this Court's authority to overrule existing Colorado law based on a modern trend.

18

the notice was untimely and the delay was unreasonable; if so, the trial court addresses whether the insurer was prejudiced by such untimely notice." *Friedland*, 105 P.3d at 647. To demonstrate prejudice, the insurer must "show the precise manner in which its interests have suffered, meaning that an insurer must show not merely the possibility of prejudice, but, rather, that there was a substantial likelihood of avoiding or minimizing the covered loss." *Id.* at 649 n.5. Here, Defendants have established that notice was untimely as to losses caused by Century, because the loss was discovered in January 1998. In March 1998, USF&G increased its coverage from one million to three million dollars. Defendants' Motion, Dock. #80, Exhs. 4, 5. Although Plaintiff contends that this increase was due to USF&G's concern that it would lose BestBank as a customer, Plaintiff cannot show that these concerns would have remained the same if Plaintiff provided timely notice of the loss to Defendants. No reasonable juror would conclude that, despite timely notification of the losses caused by Century, Defendants would in the following month triple the amount of its coverage for such losses. In addition, FDIC's Material Loss Review in 1999 states that, if FDIC had taken action "even in early 1998, [it] could have identified the extent of BestBank's problems and diminished the loss." Defendants' Motion, Dock. #80, Exh. 18 at 32. Accordingly, Plaintiff is not entitled to judgment as a matter of law on the issues that Defendants are required to establish prejudice for any late notice and that Defendants have no evidence of prejudice.

**III. Conclusion**

Accordingly, for the reasons stated above, it is hereby ORDERED that Defendants' Motion for Summary Judgment [filed March 31, 2008; docket # 80] is **granted in part and denied in part**. The motion is denied as to claim one under Section A and granted as to claim two under Section L. Plaintiff FDIC's Cross-Motion for Partial Summary Judgment [filed May 1, 2008; docket #82] is

**denied**.

It is FURTHER ORDERED that the parties shall conference together and contact Chambers at (303) 844-4507 within five business days of the date of this Order to schedule a status conference.

Dated at Denver, Colorado this 15th day of August, 2008.

BY THE COURT:

  s/ Michael E. Hegarty
Michael E. Hegarty
United States Magistrate Judge